**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PERKINELMER HEALTH SCIENCES, INC., | ) |
| | ) |
| *Plaintiff/Counterclaim Defendant*, | ) |
| | ) |
| v. | ) Civil Action No. 1:22-cv-11412-NMG |
| | ) |
| LABQ CLINICAL DIAGNOSTICS, LLC | ) |
| | ) |
| *Defendant/Counterclaim Plaintiff*. | ) |
| | ) August 13, 2024 |
| | ) |

## MOTION FOR LEAVE TO SERVE
## ADDITIONAL REQUESTS FOR PRODUCTION OF DOCUMENTS AND
## INTERROGATORIES

Plaintiff, PerkinElmer Health Sciences, Inc. ("PerkinElmer" or "Plaintiff"), moves for leave to serve Defendant LabQ Clinical Diagnostics, LLC ("LabQ" or "Defendant") with its Third Set of Requests for Production of Documents and Interrogatories (the "Third Requests"). The Third Requests seek relevant information that came to light when the U.S. Attorney's Office for the Southern District of New York recently announced a False Claims Act action against LabQ, its CEO, Moshe Landau, its COO, Daniel Adar, and related entities. Because the deadline to serve written discovery expired and PerkinElmer already served two sets of requests for production of documents months before the news of the False Claims Act action, PerkinElmer seeks leave to pursue this necessary discovery.

## RELEVANT FACTUAL BACKGROUND

This case arises from LabQ's failure to pay PerkinElmer more than $6 million for products and services provided by PerkinElmer to LabQ relating to the detection of SARS-CoV-2 ("COVID-19") over the course of several years. PerkinElmer and LabQ's business relationship

119565087.4

began in or about August 2020, when LabQ placed orders for certain COVID-19 testing products sold by PerkinElmer.[1]  Compl. ¶ 7. During the COVID-19 pandemic, LabQ had pivoted from its primary business of providing diagnostic laboratory services to nursing home residents to the COVID-19 testing space. False Claims Act Compl. ¶ 5, attached hereto as Exhibit A. Despite PerkinElmer consistently delivering testing products and services to LabQ pursuant to the parties' Agreements for a year and a half, LabQ refused to pay several invoices totaling more than $1 million in January 2022. Compl. ¶ 18-22. Even after repeated requests, LabQ failed to pay those and subsequent invoices totaling over $6 million plus accrued interest. *Id.* ¶ 23-26.

Because of LabQ's refusal to pay, PerkinElmer was forced to file this breach of contract and unjust enrichment action on September 1, 2022, seeking payment for the products and services provided to LabQ.  On June 22, 2023, LabQ filed its answer, affirmative defenses, and counterclaims for breach of contract and implied covenant of good faith and fair dealing, gross negligence, and unfair and deceptive trade practices against PerkinElmer. In its Counterclaims, LabQ alleges that it is excused from payment for over $6 million in products and services that it used because a subset of products allegedly were defective and caused delays in testing and resulted in monetary losses. Counterclaims ¶¶ 57, 64, 73. PerkinElmer vehemently denies these claims.

On September 6, 2023, PerkinElmer served its First Requests for Production and Interrogatories. On November 30, 2023, PerkinElmer served its Second Requests for Production and Interrogatories. The deadline to serve written discovery was November 30, 2023 (ECF 41).

---

[1] The parties business relationship is governed by PerkinElmer's "General Terms and Conditions of Sale – Global" and "Terms & Conditions of Sale – Life Science Reagents Products Only" which are attached to the Complaint as Exhibit 2 (hereinafter the "Agreements").

On June 13, 2024, the U.S. Attorney's Office for the Southern District of New York announced the filing of a False Claims Act against LabQ and individuals and entities associated with LabQ.  The news of this action came long after the deadline to serve written discovery in this action, and at a time when the fact discovery deadline in this action was August 2, 2024.  On July 16, 2024, PerkinElmer moved to modify the fact discovery and other case deadlines, in part because of the need to pursue discovery relating to the allegations against LabQ in the Government's complaint.  On July 31, 2024, the Court modified the case schedule and extended the fact discovery deadline to October 1, 2024.

On August 2, 2024, PerkinElmer served the Third Requests, attached hereto as Exhibits B and C, on LabQ and inquired whether LabQ objected to the service of additional written discovery.  The parties held a meet-and-confer on the issue on August 9, 2024, at which time LabQ advised PerkinElmer that it objected to service of the Third Requests as untimely under the case scheduling order and would object to any motion for leave to serve the Third Requests.

The Government's complaint alleges that LabQ fraudulently billed the government uninsured program tens of millions of dollars for COVID-19 tests provided to patients with health care coverage and for COVID-19 tests paid for by others.  These claims raise the following issues relevant to PerkinElmer's claims of non-payment and LabQ's counterclaims in this action: LabQ's CEO, Moshe Landau, founded LabQ without any prior experience or education relating to healthcare or labs.  *UNITED STATES OF AMERICA v. LABQ CLINICAL DIAGNOSTICS, LLC et al.*, 1:22-cv-00751-LJL, Doc. No. 20 at ¶ 5 (S.D.N.Y. June 13, 2024.)  In 2019, LabQ and a related entity, Dart Medical, generated less than $5 million in total revenue.  *Id*. at ¶ 38.  LabQ's revenue ballooned to over ten million dollars in 2020, and then to over one-hundred million dollars in 2021.

*Id.* at ¶ 6.  By 2023, Landau transferred over $100 million from LabQ to himself and an LLC he wholly owns and controls.  *Id.* at ¶ 7.

LabQ's scheme came at the expense of the government's uninsured program, which had only limited available funds.  When the government's uninsured program stopped accepting new claims in March 2022 due to the exhaustion of available funds, LabQ's primary source of revenue (albeit, fraudulently obtained) dried up.  In June 2022, Landau emailed LabQ executives to inform them that they "need[ed] to cut dramatically all payrolls and immediately, in order to survive," noting that "we just cannot continue like this when we don't have HRSA anymore." *Id.*[2]  It is not a coincidence that once LabQ could no longer bilk the government, it started searching for excuses not to pay Revvity.

## LEGAL STANDARD

LabQ's objection to service of the Third Requests as untimely is based on the November 30, 2023 deadline the parties had to serve written discovery.  LabQ also objects to the Third Requests as exceeding the limits of Local Rule 26.1(c), which limits parties to "2 separates sets of requests for production." L.R. 26.1(c). However, a party may make a request for additional document productions beyond that allowed under L.R. 26.1(c) by discovery motion. *See* L.R. 26.2(b) ("any requests that such party may make for additional … production of documents beyond that allowed pursuant to L.R. 26.1(c) shall be by discovery motion…").

The Court may permit parties to serve discovery requests and interrogatories after the close of discovery upon a showing of good cause pursuant to Rule 16(b)(4). In determining whether additional discovery should be permitted under the good cause standard, a significant consideration

---

[2] HRSA is a reference to the Health Resources and Services Administration, the governmental entity that administered the uninsured patient program.

is whether there has already been an adequate opportunity for discovery. *Vineberg v. Bissonnette,* 548 F.3d 50, 55 (1st Cir. 2008).  Courts also consider the reasoning for the failure to complete discovery within the previously established time frame, the likelihood that relevant information could be obtained if the discovery is permitted, and whether the additional discovery would delay the proceedings. *Id.*

Additionally, in analyzing whether additional discovery events should be permitted, courts look to Federal Rule 26(b)(1). Rule 26(b)(1) instructs that "[p]arties may obtain discovery" of non-privileged matters "relevant to" a claim "and proportional to the needs of the case" taking into consideration certain factors. Fed. R. Civ. P. 26(b)(1). In determining proportionality, the following factors are analyzed: (1) importance of the issues at stake in the action, (2) the amount in controversy, (3) the parties' relative access to relevant information; (4) the parties' resources; (5) the importance of the discovery in resolving the issues; and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b)(1); *see Gillenwater v. Home Depot, Inc.*, Civil No. 20-10338-DJC, 2021 WL 6206995, at *1 (D. Mass. Nov. 23, 2021) (discussing factors to be analyzed in assessing the proportionality of the request).

## ARGUMENT

Rule 16's "good cause" standard "focuses on the diligence of the moving party more than it does on any prejudice to the party-opponent." *Somascan, Inc. v. Philips Med. Sys. Nederland, B.V.*, 714 F.3d 62, 64 (1st Cir. 2013). Here, PerkinElmer acted diligently upon learning of the Government's False Claims Act action against LabQ. In particular, PerkinElmer moved for an extension of the fact discovery deadline and, promptly following the extension of that deadline, served the Third Requests and conferred with LabQ about the Third Requests. Further, the fact that PerkinElmer did not know about the False Claims Act action against LabQ until it was

announced in June 2024 provides a persuasive explanation for its inability to request the information contained in the Third Requests in its prior discovery requests.

The facts and circumstances described in the Government's complaint against LabQ are relevant to a number of issues in this case. LabQ's business apparently relied on its ability to fraudulently charge the Government's uninsured patient program for COVID-19 testing. When those funds were exhausted, LabQ stopped paying PerkinElmer, casting substantial doubt over the credibility of LabQ's counterclaims that its refusal to pay was supported by problems with PerkinElmer's products and resulting financial damage to its business. The Government's complaint also asserts that millions of dollars were transferred from LabQ's coffers to Landau's personal accounts during the time period that LabQ refused to pay PerkinElmer. More broadly, LabQ's damages allegations put at issue the financial performance of its COVID-19 testing business and revenue sources, and the Government's complaint raises substantial questions over the reliability of the information LabQ has produced to date to support its claims that its business was harmed and it lost customers due to PerkinElmer's products. Finally, the credibility of LabQ's witnesses, particularly Landau and Adar, will be a significant issue in this case, and the fraudulent scheme detailed in the Government's complaint plainly is relevant to their credibility.

Under Rule 26(b)(1), relevance is "broadly construed at the discovery stage." *Green v. Cosby*, 152 F.Supp.3d 31, 35 (D. Mass. 2015). Specifically, a party may obtain documents that are "relevant to any party's claim or defense" and that requested information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Here, PerkinElmer's Third Requests seek documents produced by LabQ concerning the fraudulent billing practices implemented as a part

of its double billing scheme, as well as documents concerning LabQ's finances and corporate governance.[3]

The importance of the issues at stake in this action weigh in favor of PerkinElmer. First, Defendant drained limited funds allocated by Congress for the provision of essential COVID-19 testing to uninsured individuals, which ultimately impacted the availability of these funds for their intended purpose. The same parties improperly using these funds should not be permitted to avoid paying for over $6 million in products and services they used. Second, the parties' access to relevant information weighs in favor of PerkinElmer. PerkinElmer needs access to certain internal documents, communications, and financial records to rebut LabQ's claims. However, LabQ holds the bulk of this relevant information, justifying additional discovery requests aimed at these targeted categories of documents.

Third, the requested discovery is important to the resolution of the issues in this action. PerkinElmer needs complete financial information from LabQ to rebut LabQ's defense that it suffered monetary damages as a result of PerkinElmer's products and services which LabQ uses to justify its failure to pay its invoices. Lastly, the burden or expense of the proposed discovery does not outweigh its benefit. Given that LabQ recently produced the same or similar sets of documents to the Government, these documents could be simply reproduced to PerkinElmer in a quick and cost efficient manner.

Accordingly, the documents and information requested in PerkinElmer's Third Requests are relevant and proportional to the needs of the case. The discovery requested is not duplicative of previous requests, cannot be obtained elsewhere, and PerkinElmer had no opportunity to obtain

---

[3] The second and fourth factors both weigh in favor of PerkinElmer and are briefly analyzed here. The amount in controversy is substantial at over $6 million, which justifies comprehensive discovery concerning LabQ's financial data to allow PerkinElmer to rebut LabQ's defenses and counterclaims.

the requested documents earlier in this action because the False Claims Act action against LabQ was only recently announced.

**CONCLUSION**

PerkinElmer respectfully requests that the Court grant its Motion for Leave to serve additional discovery requests.

Respectfully Submitted,

**PERKINELMER HEALTH SCIENCES, INC.**

By its attorneys,

Dated:  August 13, 2024

/s/ *Erick M. Sandler*
Erick M. Sandler (BBO #653868)
*emsandler@daypitney.com*
Elizabeth A. Alquist (*pro hac vice*)
*eaalquist@daypitney.com*
Juliana M. Campochiaro (*pro hac vice*)
*jcampochiaro@daypitney.com*
Emily Ferriter Russo (*pro hac vice*)
*eferriterrusso@daypitney.com*
Woo Sin Sean Park
*wpark@daypitney.com*
Day Pitney LLP
Goodwin Square
225 Asylum Street
Hartford, CT 06103-1212
Telephone:  (860) 275-0100
Fax:   (860) 881-2459


Naju Lathia
One Jefferson Road
Parsippany, NJ 07054
*nlathia@daypitney.com*
Telephone: (973) 966-8082
Fax: (973) 206-5804


*Attorneys for Plaintiff/Counterclaim
Defendant PerkinElmer Health Sciences, Inc.*

## <u>LOCAL RULE 7.1(a)(2) CERTIFICATE OF COMPLIANCE</u>

I, Erick Sandler, hereby certify that on August 9, 2024 counsel for Revvity conferred with counsel for Defendant/Counterclaim Plaintiff LabQ Clinical Diagnostics, LLC ("LabQ") who indicated that LabQ does not consent to PerkinElmer's service of additional discovery requests or this motion.

<u>/s/ *Erick M. Sandler*</u>
Erick M. Sandler

119565087.4

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 13, 2024.


*/s/Erick M. Sandler*
Erick M. Sandler

119565087.4

-10-