United States District Court
District of Massachusetts

| | |
|---|---|
| PERKINELMER HEALTH SCIENCES, INC.,<br><br>        Plaintiff,<br><br>        v.<br><br>LABQ CLINICAL DIAGNOSTICS LLC,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No.<br>22-11412-NMG |

### MEMORANDUM & ORDER

**GORTON, J.**

Plaintiff and counterclaim defendant PerkinElmer Health Sciences, Inc. ("PerkinElmer") brings a one-count breach of contract action against defendant and counterclaim plaintiff LabQ Clinical Diagnostics, LLC ("LabQ") for allegedly failing to pay $ 6.3 million owed for products relating to the detection of COVID-19.[1]

LabQ, in turn, alleges that PerkinElmer misrepresented the efficacy of its COVID-19 testing products and falsely blamed LabQ for the products' defects. LabQ brings counterclaims of breach of contract (Counterclaim I), gross negligence

---

[1] The parties have stipulated to the dismissal of Count II of the complaint (Docket No. 153), which pled unjust enrichment in the alternative to Count I, alleging breach of contract.

(Counterclaim II) and unfair and deceptive trade practices in violation of M.G.L. c.93A ("Chapter 93A") (Counterclaim III).

## I.    **Background**

PerkinElmer is a Delaware corporation with a principal place of business in Waltham, Massachusetts.  LabQ is a limited liability company with a principal place of business in New York City.  Its members are citizens of New York, New Jersey and Florida.

Beginning in March, 2020, in response to the COVID-19 global pandemic, the Food and Drug Administration ("FDA") granted Emergency Use Authorizations ("EUAs") for products created to detect the COVID-19 virus.  The FDA granted EUAs for two PerkinElmer products over the course of the pandemic: 1) the New Coronavirus Nucleic Acid Detection Kit ("New Covid Kit"), which was authorized for use in conjunction with two other PerkinElmer products (the "Chemagic Kit" and "Chemagic 360 instrument"); and 2) the PKAMP respiratory SARS-CoV-2 RT-PR panel ("PKAMP Kit"), which could detect multiple viruses, including COVID-19.

Pursuant to the terms of the EUAs, PerkinElmer was required to report to the FDA suspected false positive or negative results as well as

> significant deviations from the established
> performance characteristics of the product of
> which [PerkinElmer] becomes aware.

-2-

The EUA also required that users of the Kit follow its FDA-approved "Instructions for Use" ("IFUs"). The parties dispute certain representations made in the IFU regarding the positive and negative controls for the test kit. According to LabQ, the IFU represented that the kit's controls were "100% accurate," while PerkinElmer maintains that the provisions at issue merely "provide guidance for interpreting" the control results.

All PerkinElmer sales are governed by its "General Terms and Conditions of Sale – Global" ("the General Terms") as well as additional terms and conditions specific to the type of product sold. The "Terms and Conditions of Sale – Life Science Reagents Products Only" ("the Reagent Terms") apply to any reagents supplied by PerkinElmer, including the New Covid Kits, PKAMP Kits and Chemagic Kits. Each invoice for the products that a customer orders incorporates the applicable Terms and Conditions.

Between March, 2020, and May, 2023, PerkinElmer received a number of questions or complaints from customers about the New Covid Kits. The parties dispute the relevance of these reports and whether the performance issues observed were the result of external contamination, user error or defects with the kits themselves. Where the parties agree is that PerkinElmer did not report those complaints to the FDA or to LabQ at any point before or during the parties' commercial relationship.

-3-

The commercial relationship between PerkinElmer and LabQ began in August, 2020, when LabQ first purchased various PerkinElmer products, including New Covid Kits.  Each time LabQ placed an order with PerkinElmer for New Covid Kits, LabQ would submit a purchase order and receive, in return, an invoice from PerkinElmer.  That invoice would reflect the product and total price and would incorporate the General Terms and Reagent Terms.

Between November, 2020, and January, 2021, LabQ alleges that it received three lots of New Covid Kits that included defective products: Lot Nos. K20030 (received November 25, 2020), K20041 (received January 16, 2021) and K20055 (received January 28, 2021).

In early January, 2021, LabQ reported to PerkinElmer that it was experiencing an unusually high number of positive test results.  PerkinElmer recommended that LabQ clean the instruments used to extract samples before testing them using the New Covid Kits.  LabQ followed the advice of PerkinElmer and the problem appeared to resolve.

Sometime after January 11, 2021, LabQ again reported that they were experiencing a concerningly high number of positive test results.  The New York Board of Health ("the Board") initiated an inspection of LabQ's laboratory, located in Brooklyn, New York.  The Board suggested that, in order to remain in operation through the inspection period, LabQ should

-4-

use another platform, i.e., testing kit, to perform testing or
else send its samples out to another laboratory to do so.   In
response, LabQ halted its use of the New Covid Kits and switched
to using a PCR test supplied by the CDC ("the CDC Assay").

Between January and June, 2021, PerkinElmer conducted
extensive troubleshooting of the allegedly defective kits, both
on-site at LabQ and off-site at its Austin, Texas facility.   The
parties vehemently dispute whether the troubleshooting confirmed
that defective products caused the testing anomalies and whether
PerkinElmer's efforts were made in bad faith to avoid liability
for the test results.   PerkinElmer replaced or credited LabQ for
each of the disputed lots.

In August, 2021, the CDC announced that it was withdrawing
the EUA for the CDC Assay.   PerkinElmer then approached LabQ
about restarting the commercial relationship, suggesting that
LabQ once again use its New Covid Kits or start to use its
"PKAMP" Kits instead.   LabQ agreed and, between October, 2021,
and December, 2021, it placed at least five orders for New Covid
Kits and one order for a PKAMP Kit.

On January 10, 2022, LabQ reported unexpected testing
results from kits in a lot received on January 5, 2022.
PerkinElmer began investigating the complaint, replacing the lot
in the meantime.

Between January, 2022 and July, 2022, LabQ purchased additional products and services from PerkinElmer. PerkinElmer timely delivered the products but LabQ failed to pay the invoices. The final invoice, dated July 12, 2022, reflected an outstanding aggregate balance of $6,293,574.81.

On September 1, 2022, PerkinElmer filed a two-count complaint in this Court against LabQ alleging breach of contract and, in the alternative, unjust enrichment. PerkinElmer sent LabQ a final letter demanding payment on September 19, 2022 but did not receive a response and consequently effected service on September 30, 2022. According to plaintiff, LabQ's counsel responded to PerkinElmer that same day and claimed it did not owe PerkinElmer any outstanding amount. In December, 2023, LabQ filed a motion to dismiss the unjust enrichment claim, which the Court denied. LabQ thereafter filed its response and counterclaim complaint, alleging breach of contract and the implied covenant of good faith and fair dealing (Counterclaim I), gross negligence (Counterclaim II) and unfair and deceptive trade practices, in violation of M.G.L. c.93A, §§ 2 and 11 (Counterclaim III).

Both parties now cross-move for summary judgment under Fed. R. Civ. P. 56 on all claims.

## II.  **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to go beyond the pleadings and set forth specific facts showing that there remains a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmoving party must show via "submissions of evidentiary quality, that a trial worth issue persists." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006).

The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable

inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).

III.  **Application**

    A. Count I: **Breach of Contract**

PerkinElmer's claim is simple.  The parties made a binding agreement that PerkinElmer would sell certain products to LabQ and, in return, LabQ would pay for those products.  PerkinElmer delivered the goods, LabQ accepted them but failed to pay the invoices.

The parties' agreement and LabQ's subsequent failure to pay are clearly reflected in the dozens of seller's invoices sent to LabQ between January and July, 2022, attached as exhibits to the complaint.  The invoices all indicate that they remain open, i.e., LabQ has not paid them.

LabQ's defenses are underwhelming.

First, it asserts that PerkinElmer "cannot prove" any outstanding debt owed to them by LabQ but does not contest the authenticity of the invoices submitted.  LabQ then makes a pedantic argument that, because PerkinElmer did not properly cite its statement of undisputed material facts ("SUMF") in support of its claim, it is not entitled to summary judgment. Earlier in its memorandum, PerkinElmer cited extensively to the record, including to the exhibit containing the invoice copies,

in support of its claim, so its failure to include redundant citations in its memorandum does not negate its claim.

LabQ asserts, _arguendo,_ that it is excused from performance due to PerkinElmer's own breach of contract, as alleged in Counterclaim I, but that assertion is unavailing because this case involves multiple contracts. Each invoice from PerkinElmer constitutes an independent contract which is, itself, subject to the applicable PerkinElmer terms and conditions.

LabQ insists there were two valid contracts between the parties, each of which PerkinElmer breached by its sale of defective products to LabQ. LabQ appears to be under the mistaken impression that the General Terms and Reagent Terms are, in themselves, contracts. In fact, the Terms are incorporated into the separate invoices, each of which constitutes a separate contract between the parties. The first provision of the General Terms clarifies the distinct nature of each invoice:

> [The General] Terms and the accompanying quotation, sales confirmation, bill of lading, and/or invoice document (collectively, this "Agreement") comprise the entire agreement between the parties . . . .

That distinction is critical because the lots which LabQ claims were defective (and thus in violation of Terms' warranty provision) are not the lots for which LabQ declined to reimburse PerkinElmer. LabQ alleges that PerkinElmer's breach of pre-2022

contracts excuses its performance of post-2022 contracts. <u>See</u>
R.A. Lord, 13 Williston on Contracts, § 39.2, at 512 ("A party
to a contract is not excused for nonperformance due to the fact
that the other party to the contract has breached a separate
contract between them . . . ."). That allegation is unfounded.

In any event, the Terms expressly prohibit withholding of
payment "by reason of any set-off or dispute with PerkinElmer,"
and LabQ proffers no rebuttal.

LabQ breached its contracts with PerkinElmer by failing to
pay more than $6 million for the 2022 invoices, and the Court
will, therefore, award summary judgment to PerkinElmer on Count
I.

### B. Counterclaim I: Breach of Contract

LabQ counterclaims that PerkinElmer is liable to it for: 1)
breach of warranty, 2) breach of the implied warranty of
merchantability and 3) breach of the implied covenant of good
faith and fair dealing.

### 1. Warranty Provision

The reagent warranty provision of the contract, applicable
to New Covid Kits, provides, "at the time of shipment, all such
[p]roducts shall conform to PerkinElmer's published
specifications." LabQ avers that the New Covid Kits in the
offending lots did not conform with the published

-10-

specifications, i.e., the IFU, because the Kits produced false positives.

PerkinElmer responds that the Kits conformed with the IFU and that LabQ misrepresents its terms which do not include any promise that the New Covid Kits eliminate the risk of false positives. The Court need not resolve that interpretive dispute because the warranty provision precludes further recovery regardless of any breach.

The Terms define customers' exclusive remedy for breach of warranty as replacement or repair of the defective products or a refund of the purchase price. According to the Terms, the method of remedy is at the discretion of PerkinElmer. Here, PerkinElmer opted to replace each of the allegedly defective lots. Such a limitation on remedies is generally permissible in Massachusetts. M.G.L. c. 106, §2-719(a); see Canal Elec. Co. v. Westinghouse Elec. Co., 548 N.E.2d 182, 186 (Mass. 1990); Winter Panel Corp. v. Reichhold Chem., Inc., 823 F. Supp. 963, 969 (1993) ("Sellers of goods . . . may seek to include terms in their contract to disclaim liability for breach of warranty, U.C.C. § 2-316, and to limit the remedies available to the buyer in the event of breach).

LabQ does not dispute this as a factual matter. In his deposition, Yelimar Guzman-Fondacci, a purchasing manager at LabQ, explicitly confirms that PerkinElmer replaced the

-11-

allegedly defective New Covid Kits, and there is no claim that the replacement lots were, themselves, defective.

Consequently, the Court need not assess the substance of the alleged violations. The Terms describe the exclusive remedies available to customers in the case of breach, Danieli & C. Officine Meccaniche S.p.A v. Morgan Construction Co., 190 F. Supp. 2d 148, 156 (D. Mass. 2002) ("[I]n order for a limitation of damages provision to bar suit for specific performance, the intent of the parties to provide an exclusive remedy must be explicit."). PerkinElmer provided those remedies (although, notably, without admitting that it breached the contracts in question). The Court will therefore dismiss LabQ's breach of contract counterclaim to the degree it alleges a breach of the express terms.

### 2. Implied Warranty of Merchantability

LabQ's claim of breach of the implied warranty of merchantability will be dismissed outright because PerkinElmer disclaimed that warranty in the Terms. Under Massachusetts law, a contract in which a seller seeks to disclaim the implied warranty of merchantability must "mention merchantability and in case of a writing must be conspicuous." Plastic Surgeons Assocs., S.C. v. Cynosure, Inc., 407 F. Supp. 3d 59, 80 (D. Mass. 2019) (quoting M.G.L. c. 106, § 2-316(2)). Here, the Terms include the following disclaimer in all capital letters:

-12-

> PERKINELMER EXPRESSLY DISCLAIMS AND MAKES NO
> OTHER WARRANTIES WHATSOEVER WITH RESPECT TO
> PRODUCTS AND SOFTWARE, INCLUDING WITHOUT
> LIMITATION ANY WARRANTY [] OF MERCHANTABILITY
> . . . .

The same provision goes on to state, however, that the
limitations on liability do not apply to "liability resulting
from PerkinElmer's gross negligence or willful misconduct." As
such, the viability of the instant counterclaim depends on the
viability of Counterclaim II for gross negligence. As discussed
infra, the gross negligence claim fails as a matter of law, and
in turn, the claim for breach of the implied warranty of
merchantability claim is defective.

### 3. Implied Covenant of Good Faith and Fair Dealing

LabQ separately asserts a violation of the implied covenant
of good faith and fair dealing, which prohibits parties from

> do[ing] anything which will have the effect of
> destroying or injuring the right of the other
> party to receive the fruits of the contract.

A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth.,
95 N.E. 3d 547, 560 (Mass. 2018).

LabQ makes no such showing. Even if the five lots in
question were defective, PerkinElmer made LabQ whole, complying
with the warranty provision and replacing those lots with new
lots which, by all accounts, worked as advertised. To plead a
breach of the implied covenant, plaintiff must allege "unfair
leveraging of the contract terms to secure undue economic

-13-

advantage." Christensen v. Kingston Sch. Comm., 360 F.Supp.2d
212, 226 (D. Mass. 2005).  LabQ paid for the same number of non-
defective lots as they received from PerkinElmer.

As such, Counterclaim I will be dismissed in its entirety.

### C. Counterclaim II: Gross Negligence

As with any tort claim, a plaintiff asserting gross
negligence must first prove: 1) a legal duty owed by defendant
to plaintiff; 2) a breach of that duty; 3) proximate or legal
cause; and 4) actual damage or injury. McLeod v. Fessenden Sch.,
624 F. Supp. 3d 45, 50 (D. Mass. 2022) (citing Jorgensen v.
Mass. Port Auth., 905 F.2d 515, 522 (1st Cir. 1990)).

Unlike ordinary negligence, however, a claim of gross
negligence requires acts "of an aggravated character" that show
"indifference to present legal duty and to utter forgetfulness
of legal obligations so far as other persons may be affected."
Altman v. Aronson, 231 Mass. 588, 592 (1919).

LabQ's claim is deficient, first and foremost, because the
negligence theory (or theories) on which LabQ relies is unclear
from the counterclaim.

LabQ characterizes the following conduct by PerkinElmer as
gross negligence:

> 1) knowingly and willfully providing defective
> reagents to LabQ during the COVID-19 pandemic,
> and failing to replace those reagents and
> consumables when notified repeatedly of their
> deficient nature, and

-14-

> 2) knowingly and/or willfully misrepresenting to LabQ during the COVID-19 pandemic that its consumables would permit LabQ to test significantly more samples than PerkinElmer's consumables actually allowed.

LabQ adds, in a footnote, that gross negligence is pled in the alternative, presumably to the breach of contract counterclaim (which describes PerkinElmer's breach of warranty as "gross negligence and/or willful misconduct.").

Later, in its opposition to plaintiff's motion for summary judgment, LabQ asserts that its gross negligence claim is

> based, in part, on PerkinElmer's manufacturing defect in its Kit and PerkinElmer's response to the false positives its defective Kits caused.

Even if LabQ had sufficiently pled a manufacturing defect in its complaint, which it did not, it proffers no evidence in support of that counterclaim because

> [t]o prove a manufacturing defect, a plaintiff must demonstrate that there is a deviation from the design that rendered the product unreasonably dangerous and therefore unfit for its ordinary purpose.

Sundaramurthy v. Abbott Vascular, Inc., 775 F. Supp. 3d 576, 585 (D. Mass. 2025) (quoting Burnham v. Wyeth Labs. Inc., 348 F. Supp. 3d 109, 112 (D. Mass. 2018)) (cleaned up). LabQ alleges no facts related to the design of the New Covid Tests nor how the purported defect rendered the product "unreasonably dangerous."

-15-

Furthermore, in Massachusetts, a negligence claim must be supported by expert testimony unless it is so obvious as to be within the common knowledge of potential jurors. See Haggerty v. McCarthy, 181 N.E.2d 562, 565 (Mass. 1962). That is especially true in a case involving "questions of medical science or technology." Held v. Bail, 547 N.E.2d 336, 338 (Mass. App. Ct. 1989).

LabQ alleges here that PerkinElmer provided "defective reagents" and failed "to replace those reagents and consumables" despite being notified of their defective nature. Allegations with respect to the efficacy of COVID tests and their conformance with the technical performance standards would not be within the jury's common medical or scientific knowledge. Accord Commonwealth v. Smythe, 23 Mass. App. Ct. 348, 353 (1987) ("[T]he reliability of chemical tests and the application of scientific principles and formulae are matters outside the common knowledge of jurors."). LabQ effectively concedes that they have presented no expert testimony.

PerkinElmer's Motion for summary judgment as to Counterclaim II will be allowed.

### D. Counterclaim III: Unfair and Deceptive Trade Practices

Finally, LabQ alleges that PerkinElmer's misrepresentations about its testing products and attempts to shift the blame to LabQ constitute a violation of Chapter 93A, which sanctions

-16-

"unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005) (quoting M.G.L. c. 93A, § 2).

A prerequisite to a Chapter 93A claim is that the conduct alleged must have occurred "primarily and substantially within Massachusetts." Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 52 (1st Cir. 1998) (quoting M.G.L. c. 93A, § 11). Although such a determination is fact-specific, it is nevertheless a question of law for the Court.  Whitman & Co., Inc. v. Longview Partners (Guernsey) Ltd., No. 14-CV-12047-ADB, 2015 WL 4467064, at *11 (D. Mass. July 20, 2015) (citing Arthur D. Little, Inc., 147 F.3d at 55; In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d at 194).

The Massachusetts Supreme Judicial Court ("the SJC") has rejected any precise formula for making that determination, instead instructing courts to engage in a fact-intensive inquiry to assess the context of the claim and "the center of gravity of the circumstances that give rise to the claim." Kuwaiti Danish Comput. Co. v. Digit. Equip. Corp., 781 N.E.2d 787, 798-99 (2003).  It is the burden of the respondent to show that the alleged misconduct occurred "primarily and substantially outside Massachusetts." Roche v. Royal Bank of Can., 109 F.3d 820, 829 (1st Cir. 1997).  PerkinElmer has carried its burden here.

-17-

The misconduct alleged by LabQ which serves as the basis of its Chapter 93A counterclaim is:

1) receiving credible complaints about its product's performance and not only not disclosing the performance failures to its customers but continuing to sell the product;

2) inducing LabQ to purchase its COVID-19 products by affirmatively misrepresenting the quality and reliability of its products; and

3) seeking to convince LabQ that its own purported user error and laboratory contamination caused the false positives.

Massachusetts was not the center of gravity for any of that alleged conduct.

Although PerkinElmer is (and thus a number of its employees are) based in Massachusetts, the employees who made the statements that allegedly induced LabQ's purchases were not located in Massachusetts. Jenny Hyka and Joe Halloran both provided sworn statements, unrebutted by LabQ, that they were not in Massachusetts during the relevant time period, either working from home (in New Jersey and Connecticut, respectively) or on-site at LabQ (in New York).

Even if the Court attributes the statements and nondisclosures as having been made at PerkinElmer HQ in

-18-

Massachusetts, the cases on which LabQ relies make clear that Massachusetts is not the center of gravity because the alleged injured party (LabQ) received and was influenced by the statements and nondisclosures outside of Massachusetts, i.e., at LabQ's New Jersey and Brooklyn-based laboratories. Roche, 109 F.3d at 829 (noting that one factor for assessing the geographic prerequisite for Chapter 93A liability is "where plaintiff was deceived and acted upon the deception"). Furthermore, the injury was manifested and felt exclusively outside of Massachusetts, in those same LabQ locations. Id.; Cambridge Plating Co. v. NAPCO, Inc., 876 F. Supp. 326, 336 (D. Mass. 1995), vacated, in part, on other grounds, 85 F.3d 752 (1st Cir. 1996) (concluding that Massachusetts was the "center of gravity" of the misconduct because, inter alia, "the injury to plaintiff occurred exclusively within the Commonwealth").

LabQ relies on the Massachusetts choice-of-law provision in the contract to establish Massachusetts as the center of gravity, but that is unavailing. The First Circuit has explicitly held that contract provisions requiring Massachusetts law to govern do not "require a finding that the center of gravity for Chapter 93A liability is Massachusetts" when the allegedly unfair or deceptive conduct did not occur primarily or substantially in the Commonwealth. Sonoran Scanners, Inc., 585 F.3d at 546 (citing Bushkin, 473 N.E.2d at 636, 638).

-19-

Furthermore, much of the "unfair" or "deceptive" conduct occurred <u>before</u> the parties had entered into any contract.  LabQ repeatedly asserts in their motion for summary judgment that PerkinElmer made misrepresentations and omissions in order to "induce LabQ to purchase its COVID-19 products."  Such alleged deception, perhaps best framed as fraudulent inducement, sounds in tort, not contract law.  Thus, the terms of the contracts between the parties are not relevant to the 93A claim. <u>See</u> <u>Plastic Surgery Assocs., S.C.</u> v. <u>Cynosure, Inc.</u>, 407 F. Supp. 3d 59, 78 (D. Mass. 2019); <u>Ne. Data Sys.</u> v. <u>McConnell Douglas</u> <u>Comput. Sys., Co.</u>, 986 F.2d 607, 609 (1st Cir. 1993).

Accordingly, Counterclaim III will be dismissed.

## ORDER

For the foregoing reasons, the motion for summary judgment of defendant and counterclaim plaintiff, LabQ, (Docket No. 157) is **DENIED**, and the motion for summary judgment of plaintiff and counterclaim defendant, PerkinElmer, (Docket No. 172) is **ALLOWED**.

**So ordered.**

Nathaniel M. Gorton
Senior United States District Judge

Dated: September 16, 2025